# Bolin v. Commonwealth.

October 11, 1949.

George D. Dorroh for appellant.

A. E. Funk, Attorney General, and H. D. Reed, Jr., Assistant Attorney General, for appellee.

JUDGE HELM—Affirming.

Appellant was charged with grand larceny. At a trial before a jury he was found guilty and his punishment fixed at five years in the state reformatory. From a judgment entered on that verdict he appeals.

The appellant, a resident of Lexington, was charged with Paul Garland and Ervin Manley with stealing "four shoulders and four hams of fresh pork meat from the smokehouse of J. R. Cleveland," in Grant County

"in December, 1948." Appellant moved for a separate trial. The Commonwealth elected to try appellant.

Cleveland lived on a farm about 350 yards from the home of Cash Carpenter. Fronie Carpenter, a house-keeper, and her son, Joe Collins, were living at the Carpenter home. Cleveland had killed hogs and had four hams and four shoulders in his smokehouse, just below his house. On December 13, 1948, Cleveland and his wife were bulking tobacco at a barn some 270 yards from his house. No one was left at the house. When the Clevelands returned to their home, the four hams and four shoulders had been stolen. The hams and shoulders would have weighed from eighteen to twenty pounds, the shoulders probably a little less. The hams were worth about 75c and the shoulders about 60c per pound.

On Sunday, December 12, 1948, Joe Collins, 13 years of age, while at the woodpile near the Carpenter home, saw the appellant, Paul Garland, and Ervin Manley, who was working for Carpenter, in a "dark looking car." He didn't see them until about the time they drove up to the woodpile. He heard all of them talking in the car, "something about meat." On Monday the 13th, about 8:30 or 9 a. m., appellant and Paul Garland came back, parked their car at a gate across the creek from the Carpenter home and went hunting up on the hill for 25 or 30 minutes. They came back with Manley. Manley asked if Mr. and Mrs. Cleveland were at home. Joe told him that they had gone to strip tobacco. Albert Bolin and Paul Garland got in the car and drove to the Cleveland home, parked the car "right there by the house * * * kinda in front." Joe saw appellant and Paul Garland go to the smokehouse; saw them carry something in their arms—wrapped in white sacks—from the smokehouse to their car. They made several trips between the smokehouse and the car.

On cross-examination Joe was asked about where appellant and Garland parked their car and what they did when they got there. Joe replied, "Nothing, only got the meat." Asked how they got the meat and what they did with it, he answered, "They packed the meat from the smokehouse to the car." Asked if he knew what was in the sacks, Joe stated that he did not. Joe saw them driving fast, away from the Cleveland home.

Some 30 minutes or more after they left, Cleveland came over to the Carpenter home and reported that his meat had been stolen.

Zella Moore Anness, who lived on the road from the Cleveland home, toward Lexington, identified appellant as the driver of a black two-seated automobile which stopped at her home on Monday, December 13, and asked her if they "could go down the creek." Another man was in the car. Appellant drove on toward the Cleveland home.

Fronie Carpenter saw apellant and Paul Garland near the Carpenter home on Sunday, December 12, and again on Monday, December 13. She was in the house working and did not see them drive toward the Cleveland home on the 13th.

Between 8 and 9 a. m., December 13, 1948, Nathan Haley met a black automobile, a strange machine in that neighborhood, going in the direction of the Cleveland home. Two men were on the front seat but he did not note them carefully enough to identify them.

On Sunday, December 12, Cecil Maddox was talking to Ervin Manley, who was working for Carpenter at the time, when a black automobile came up past Mr. Cleveland's home. Two men were in the automobile. He did not know them.

Cleveland, recalled, stated that "the day the meat was stolen, * * * automobile tracks pulled into my lot."

Appellant's defense was an alibi. He stated that he was at his home in Lexington on Sunday; that he took his nieces to Sunday school that morning; that he and his wife went to a show in the afternoon; that he answered a telephone call for his wife; that Monday the 13th was a rainy day; that he went out in Lexington looking for someone to help him work; that later in the morning, around 9:30 or 10, he came back home; that his mother-in-law, Mrs. Garland, called him and asked for his wife, Margaret. Asked if he "stole this meat," he replied that he did not. On cross-examination he admitted that he had been convicted of two felonies.

Marie Wardle, of Lexington, mother of appellant, stated that her son was at home on Sunday and Monday,

December 12 and 13. Mrs. Minnie Garland, mother-in-law of appellant and mother of Paul Garland, jointly charged with appellant, stated that appellant was at his home in Lexington on December 12 and 13. Without objection she stated that her son, Paul, had been in the penitentiary one time.

Appellant assigns as errors: (1) That the court erred in not sustaining a motion for a directed verdict at the close of the Commonwealth's evidence, and again at the close of all the evidence; (2) that the verdict was flagrantly and palpably against the evidence, and (3) that the court erred in not sustaining appellant's motion for a new trial.

Joe Collins, principal witness for the Commonwealth, was 13 years of age. He is not in any way impeached. He was given a careful cross-examination but this did not lessen the effect of his testimony. In fact, its effect was strengthened by the cross-examination. Appellant seems to question the ability of Joe to recognize appellant as one of the men who removed the sacks of meat from the smokehouse. It is true he was more than 300 yards from appellant, but Joe had watched appellant and his companion leave the Carpenter home and drive to the Cleveland home; had seen them park their car, get out and go to the smokehouse and carry objects from the smokehouse to their car. This is the sort of thing that would arouse the curiosity of a boy this age and fasten his attention upon their actions.

From the evidence which we have summarized, it is apparent that the Commonwealth offered sufficient evidence to take the case to the jury.

There was a sharp conflict in the evidence. The jury saw and heard the witnesses. They were the judges of the weight and credibility of the testimony. In such a case, the jury may accept the testimony of one set of witnesses as against the testimony of others. In many cases verdicts of guilt have been sustained where the only evidence offered tending to show guilt was the testimony of a child.

Appellant says: "In the indictment the appellant is charged 'did with force and arms,' and there was no evidence introduced nor any intimation that Bolin used

any force or was in any manner armed at anytime he is said to have been near the Cleveland home. * * * The proof and the allegations must substantially agree. On this point alone the court should have dismissed the action, since there was no proof offered to support this charge."

Criminal Code of Practice, sec. 126, provides: "An indictment need not allege that the offense was committed or the act done * * * 'with force and arms.'" The allegation "with force and arms" was not a material allegation, but was immaterial surplusage and did not require proof.

Appellant's counsel objected to the State's proving by appellant that he had been convicted of a felony. The trial court, without request from counsel, properly admonished the jury as to proof that appellant had been convicted of a felony. This testimony was in no way prejudicial. See Civil Code of Practice, sec. 597.

Appellant requested a new trial on the grounds of newly discovered evidence. The affidavits show that this evidence would have been only cumulative and there was no showing of due diligence.

The verdict of the jury is sustained by sufficient evidence. We find no reversible error in the record.

The judgment of the circuit court is affirmed.